UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN KATZ, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Action No. 17-cv-11595-ADB |
| | * |
| ORGANOGENESIS, INC., | * |
| | * |
| Defendant. | * |

# MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

In this employment discrimination suit, Plaintiff Susan Katz alleges that her former employer, Defendant Organogenesis, Inc. ("Organogenesis"), discriminated against her in violation of federal and state law and terminated her based on her disabilities and her use of Family and Medical Leave Act ("FMLA") leave. [ECF No. 1-1 ("Complaint" or "Compl.")]. Currently pending before the Court is Organogenesis' motion for summary judgment. [ECF No. 28]. For the reasons set forth below, summary judgment is GRANTED in favor of Organogenesis.

## I.     BACKGROUND

### A.     Factual Background

The following facts are either uncontroverted pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 or stated in the light most favorable to Ms. Katz, the non-movant.[1]

---

[1] The Court notes that while Ms. Katz purports to controvert portions of the Defendant's Statement of Undisputed Facts ("SOF"), at times she fails to cite any record evidence in support of her position. Controverted facts must be supported by reference to record evidence. See LR, D. Mass 56.1 ("A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page

Organogenesis is a pharmaceutical manufacturer that is subject to oversight by the Food & Drug Administration ("FDA") and must comply with the FDA's Current Good Manufacturing Practice regulations. [ECF No. 30 ("SOF") ¶ 2]. Organogenesis works to comply with these regulations by ensuring that preventive maintenance tasks on its equipment are carried out in a timely manner and according to standard operating procedures ("SOPs"). [SOF ¶ 3]. Preventative maintenance and calibration tasks are tracked using a computerized maintenance management system ("CMMS"). [SOF ¶¶ 5–6]. Staff must complete a written analysis of any error, referred to as "deviations," such as a missed preventative maintenance task. [SOF ¶ 9]. If more than two related deviations occur, the standard practice is to initiate a "CAPA" (a "corrective action preventive action" or "corrective and preventive action") to analyze the root cause. [SOF ¶ 10].

Ms. Katz was hired by Organogenesis in 2001 as a Facilities Coordinator to help administer the CMMS for preventive maintenance, which was known as "MP2." [SOF ¶¶ 11–12]. On March 13, 2006, Ms. Katz was promoted to Senior Facilities Coordinator, but her responsibilities largely stayed the same. [SOF ¶¶ 13–14]. Ms. Katz took medical leave for a surgical procedure from September 27 to October 11, 2011, which did not adversely affect her employment. [SOF ¶¶ 30–31]. Ms. Katz's work with the MP2 system resulted in positive job performance evaluations from her then-supervisors and a promotion in 2012 to Supervisor of Facilities Planning. [SOF ¶¶ 15–17, 31; ECF No. 32-1 at 9]. As Supervisor of Facilities Planning, Ms. Katz worked with the quality assurance department on audits, internal deviations,

---

references to affidavits, depositions and other documentation."). The portions of the SOF not specifically controverted with support in the record are deemed admitted. See Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) ("In the event that a party opposing summary judgment fails to act in accordance with the rigors that [a local rule governing summary judgment] imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated.").

CAPAs, and SOPs. [SOF ¶ 18]. Her direct supervisor was the Facilities Manager, who was Mike Bukoff at the time of the promotion. [SOF ¶ 22]. Ms. Katz also supervised three direct reports: Brenda Lehan, a facilities coordinator; George Severance, a document specialist; and Marie Manning, a facilities associate. [SOF ¶¶ 19–21; ECF No. 32-1 at 14–15].

Between 2012 and early 2013, Organogenesis moved from the MP2 CMMS to a system called Regulatory Asset Manager ("RAM"). [SOF ¶ 23]. The RAM system was intended to replace both MP2, which tracked preventative maintenance management, and Calman, which tracked calibration management. [SOF ¶ 24]. The data from both systems was migrated into the RAM system. [SOF ¶ 24]. Ms. Katz was part of a team of approximately ten people that transitioned preventative maintenance management from MP2 to the RAM system. [SOF ¶ 27; ECF No. 35-1 at 5].

In 2013 or 2014, Ms. Katz began suffering from myofascial pain syndrome, a tightening of muscles that causes headaches, fatigue, and pain. [SOF ¶ 32].[2] She took medical leave in May 2015 for three weeks for sinus surgery and used FMLA leave. [SOF ¶¶ 34–35]. This leave did not adversely affect her employment. [SOF ¶ 36].

Near the beginning of 2015, a CAPA known as CAPA 15-007-DR ("the CAPA") was opened to address numerous problems with the RAM system. [SOF ¶ 37]. Ms. Katz was involved with writing the CAPA and signed off on the action plan as the team leader. [SOF ¶¶ 38, 40; ECF No. 35-3 at 20 (noting that writing the CAPA was a "combined effort" of several employees)]. The CAPA concerned preventive maintenance records that were not correctly entered into the RAM system. [SOF ¶ 39]. The action plan for the CAPA included six tasks,

---

[2] At some point, Ms. Katz was diagnosed with cervical dystonia, a condition causing neck pain, but this condition did not affect her ability to work. [SOF ¶ 33]. Ms. Katz has also been diagnosed and treated for depression since 2001. [SOF ¶ 29].

3

five of which listed either Ms. Katz alone or Ms. Katz and a subordinate or subordinates as those responsible for its completion. [SOF ¶ 41].

In August or September of 2015, Mr. Bukoff and Cheryl McManamin, who supervised Mr. Carmichael, the Calibration Manager, recommended promoting Mr. Carmichael to supervise the preventive maintenance program. [SOF ¶ 43]. Shortly thereafter, from October 2015 to January 2016, Ms. Katz took medical leave due to her myofascial pain. [SOF ¶¶ 45, 60].

Ms. Katz sought, but did not receive, FMLA leave for her absence from work between October 2015 and January 2016. [SOF ¶¶ 50–55].[3] Instead, Organogenesis approved a personal leave of absence, originally covering the dates October 20, 2015 to January 6, 2016. [SOF ¶ 55]. Ms. Katz returned to work on January 12, 2016. [SOF ¶ 60]. While Ms. Katz was on medical leave, Mr. Carmichael was put in charge of the CAPA. [SOF ¶ 46].

On January 13 and 14, 2016, an outside group, CAI Consulting, conducted a mock inspection of Organogenesis' facilities maintenance and engineering functions in preparation for an upcoming audit. [SOF ¶ 61]. On January 18, 2016, CAI Consulting issued their report, which identified several issues with the preventative maintenance program. [SOF ¶ 62]; see [SOF ¶¶ 63–66]. On February 9, 2016, an Organogenesis internal audit identified 14 issues with calibration and preventive maintenance records, ten of which were assigned to Ms. Katz for the completion of "confirmation, root cause, immediate action, risk assessment and action plan." [SOF ¶ 74]. Following the internal audit, Mr. Bukoff was fired on February 22, 2016. [SOF ¶ 78]. A lead technician named Rocco Digirolamo was also fired that day. [SOF ¶ 79]. Mr. Bukoff was told that his termination was based at least in part on his failure to address issues

---

[3] Ms. Katz also sought, and was denied, short-term disability benefits through Prudential, which she appealed with the help of Mr. Bukoff and Ms. McManamin. See [SOF ¶¶ 47–49].

4

identified in the recent audit. [SOF ¶ 80]. Dave Bartorelli became Interim Facilities Manager and Ms. Katz's supervisor. [SOF ¶ 81].

Between February 2016 and May 2016, Ms. Katz suffered from Bell's Palsy, which causes facial paralysis and pain and made it difficult for Ms. Katz to use a computer or read. [SOF ¶ 83]. She was approved for FMLA leave from February 23, 2016 to March 8, 2016, and briefly returned to work. [SOF ¶¶ 84–85].

During her brief return to work in early March, Ms. Katz met with Bill Moran and Ms. Lehan and sent Mr. Moran a spreadsheet describing progress on the CAPA. [SOF ¶¶ 94, 96]. The parties dispute whether the RAM system was discussed when Ms. Katz met with Mr. Moran and how Mr. Moran treated Ms. Katz relative to Ms. Lehan. [SOF ¶¶ 94–95; ECF No. 35-2 ¶¶ 13–14, 17].

At the time, Mr. Moran was working for Organogenesis in La Jolla, CA and had applied to be the director of facilities at the company's Canton facility. [SOF ¶¶ 89, 90]. As part of the application and hiring process, Mr. Moran had received the CAI Consulting report, which led him to believe that the people responsible for the RAM system were not doing their jobs properly. [SOF ¶¶ 91–92]. He also visited the Canton facility at least twice. [SOF ¶¶ 93].

On March 11, 2016, Ms. Katz received her 2015 performance evaluation. [SOF ¶ 86]. Mr. Bukoff, who had completed the evaluation prior to his termination, gave Ms. Katz a 2.5/5 for the objective of "[a]ssist in managing a 100% completion of all PM's." [SOF ¶ 86]. Mr. Bukoff noted that "overdue PMs were a result of disconnects between MP2, RAM, SOPs and quality systems" and that "[a]cceleration of the implementation of corrective actions is needed to ensure risk is mitigated." [SOF ¶ 86]. Other employees involved with the CAPA were similarly penalized in their reviews. [ECF No. 35-3 at 22–23]. Because the Bell's Palsy was still

impacting her performance, Ms. Katz went on leave again and was approved for FMLA leave from March 11 to April 28, 2016. [SOF ¶ 87]. She planned to return to work in early May. [SOF ¶ 108].

While Ms. Katz was on leave, Mr. Moran interviewed for the facilities director job on April 6, 2012 and was offered the job. [SOF ¶ 97]. He began performing job duties in April, prior to his May 2 official start date. [SOF ¶¶ 98, 102]. On April 15, 2016, Mr. Moran received a second report from CAI Consulting called a "GAP analysis," which listed 145 issues [SOF ¶ 99; ECF No. 32-21 at 6–32]. Ten of these 145 issues were within Ms. Katz's responsibility. [SOF ¶ 101].

On May 2, 2016, Mr. Moran formally took over as facilities director and Mr. Carmichael was promoted to Manager of Calibration and Maintenance, which was the position he had been recommended for in the fall of 2015. [SOF ¶¶ 102, 107]. At this time, in addition to the CAPA, there was also a second CAPA for the building monitoring system, which was the responsibility of Dave Bartorelli, and several smaller CAPAs as well. [SOF ¶ 104]. Management and quality assurance personnel were worried about the progress that had been made on the CAPA.[4] [SOF ¶ 44]. Mr. Carmichael told Mr. Moran that he believed the problems with the preventative maintenance program stemmed from Mike Bukoff's failure to be involved. [SOF ¶ 106].

On May 17, 2016, Ms. Katz returned from FMLA leave, but was restricted to working no more than five hours a day. [SOF ¶ 111]. That same day, Ms. Katz met with Mr. Moran who

---

[4] It is unclear when management became concerned about progress on the CAPA, but the parties agree that there were concerns by May 2016. See [SOF ¶ 25; ECF No. 31 ¶ 15; ECF No. 35-1 at 8].

6

told her that she could no longer work from home, which was a department-wide policy.[5] [SOF ¶ 112]. He also asked how long she expected to be restricted to five hours a day. [SOF ¶ 112].

Ms. Katz and Mr. Moran met again in the last week of May. [SOF ¶ 113; ECF No. 35-2 ¶ 18]. During this meeting, Mr. Moran asked Ms. Katz about her direct reports, "what is the matter with you," and when she could return to a full-time schedule. [SOF ¶ 113; ECF No. 35-2 ¶ 18]. Mr. Moran noticed a "tic in [Ms. Katz's] eye" and was aware that she had been out on FMLA leave. [ECF No. 35-1 at 25]. Ms. Katz told Mr. Moran that she hoped to be able to work full-time in two weeks. [SOF ¶ 113]. After the meeting with Ms. Katz, Mr. Moran wrote to the Director of Human Resources and reported that

> [he] spoke to [Ms. Katz] today about her position being 5 days a week moving forward. She didn't balk about it. Let's see if she shows up on Monday June 6th. I asked her when she will be back at full 8 hour day and she said next week. Two questions[:] When is her disability period [o]ver? When can we proceed with re org?

[SOF ¶ 115]. By this time, he had decided to eliminate Ms. Katz's position. [SOF ¶¶ 116, 122].

Sometime in May 2016, Mr. Moran spoke with his superior, Chris O'Reilly, and relayed his belief that Ms. Katz was responsible for the state of the RAM system and that a change was needed. [SOF ¶ 117]. Mr. Moran also believed that Ms. Katz, along with Mr. Bukoff and Mr. Bartorelli, were ultimately responsible for ensuring that the information in the RAM system was correct. [SOF ¶ 118].

In a memorandum dated May 31, 2016, Mr. Moran documented his proposed restructuring of the Facilities Department and his rationale for terminating Ms. Katz. [SOF ¶¶ 119–25]. The memorandum stated that Mr. Moran had reviewed the CAI Consulting report

---

[5] While Ms. Katz was working with human resources to determine a date on which she could return to work, it came to light that Ms. Katz had worked a Tuesday through Friday schedule for over five years, during which she typically worked ten hours a day four days a week and sometimes worked from home on Mondays. [SOF ¶ 108; ECF No. 32-1 at 74–75].

and other audit findings, which revealed "that there have been issues with the RAM system for years as well as the previous system in use [MP2]" that "appear to have been the result, in part, of the prior department management and staffing." [SOF ¶ 120]. The memorandum noted that Mr. Moran's interviews with employees in the Facilities Department led him to focus on the Facilities Administration group who were responsible for the RAM system and specifically on the Supervisor of Facilities Administration role, which Ms. Katz held. [SOF ¶ 121]. The memorandum stated that Ms. Katz had "oversight of the Administration staff and RAM system during previous FDA audits, the CAI audit and also [was] responsible when CAPAs were issued." [SOF ¶ 121].[6]

Mr. Moran's interviews also led him to learn that Mr. Carmichael, the calibration manager, had previous experience managing a RAM system at another company, employees, and with the calibration side of the RAM system at Organogenesis. [SOF ¶ 122]. Mr. Moran concluded that "Organogenesis would then have two people [Mr. Carmichael and Ms. Katz] who could potentially supervise the Facilities Administration staff; however, one of them [Ms. Katz] has not demonstrated sufficient experience in RAM system operations." [SOF ¶ 122]. Mr. Moran concluded that Ms. Katz's position could, therefore, be eliminated. [SOF ¶¶ 122, 125]. Mr. Moran did not review Ms. Katz's personnel file or most recent performance review prior to deciding to terminate her. [ECF No. 32-2 at 18].

---

[6] Mr. Moran testified that he did not believe Mr. Carmichael took over ownership of the CAPA until after Ms. Katz was terminated. [ECF No. 32-2 at 36]. The parties, however, do not dispute that Mr. Carmichael took over the CAPA in October 2015 when Ms. Katz went on medical leave. See [SOF ¶ 46; ECF No. 32-3 at 10]; see also [ECF No. 32-4 at 11 (listing Mr. Carmichael as the responsible individual as of November 30, 2015)]. Ms. Katz and Mr. Carmichael seem to have shared ownership of the CAPA in January 2016. See [ECF No. 32-11 at 5–6 (listing both Ms. Katz and Mr. Carmichael as responsible for various action items)].

In addition to deciding to eliminate Ms. Katz's position, Mr. Moran also concluded that the Facilities Administration department would need to hire a Facilities System Specialist, who would be a subject matter expert for the RAM system. [SOF ¶¶ 123, 125]. The Facilities System Specialist would be responsible for "daily administration of the RAM system" while Mr. Carmichael would have "responsibility for calibration team, review of calibrations and the Facilities Administration support personnel." [SOF ¶ 123]. Mr. Moran observed that Ms. Katz did not exhibit any the skills required by this new position "based on past audits, CAPA's and my experience with the department since March." [SOF ¶ 124].

On June 1, 2016, Ms. Katz met with Mr. Moran and a human resources representative. [SOF ¶ 126]. Mr. Moran informed Ms. Katz of the reorganization, that she was being terminated, and that her direct reports Ms. Lehan and Mr. Severance would report to Mr. Carmichael. [SOF ¶ 126]. Ms. Katz was on approved intermittent FMLA leave at the time. [ECF No. 35-1 at 16; ECF No. 36 at 4 n.2].

On November 10, 2016, Mr. O'Reilly, Mr. Moran's supervisor, emailed the Organogenesis CFO an update on compliance efforts. [SOF ¶ 131]. He explained that "[w]e terminated the Facilities Manager, Maintenance Coordinator and a Lead Technician earlier this year due to compliance issues" and that Mr. Moran "was brought from the West Coast as the new department director to facilitate the re-organization and improve performance of the group." [SOF ¶ 131]. Ms. Katz was the "Maintenance Coordinator," Mr. Bukoff was the "Facilities Manager," and Mr. Digirolamo was the "Lead Technician." [SOF ¶ 131]. Also in November 2016, Organogenesis hired a Facilities Systems Specialist. [SOF ¶ 134].

The CAPA was eventually completed on December 15, 2016. [SOF ¶ 132]. Shortly thereafter, in early 2017, Mr. Bartorelli was terminated for job performance. [SOF ¶ 133].

9

### B. Procedural History

On July 31, 2017, Ms. Katz initiated this action in Norfolk County Superior Court. [ECF No. 1-1]. Organogenesis removed the case to this Court on August 24, 2017 and answered the Complaint on August 29, 2017. [ECF Nos. 1, 8]. After fact discovery closed on June 29, 2018, Organogenesis filed the instant motion for summary judgment on September 10, 2018. [ECF No. 28]. On October 10, 2018, Ms. Katz opposed summary judgment, and on October 22, 2018, Organogenesis filed a reply brief. [ECF Nos. 35, 36].

## II. LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id.

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the movant takes the position that the record fails to make out any trialworthy question of material fact, "it is the burden of the nonmoving party to proffer facts

sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

In reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give [her] a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which [s]he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III. DISCUSSION

Ms. Katz brings three separate disability discrimination claims and a FMLA retaliation claim: disability discrimination under the Americans with Disabilities Act ("ADA") (Count I), disability discrimination under Massachusetts General Laws ch. 151B (Count II), perceived disability discrimination under Massachusetts General Laws ch. 151B (Count III), and retaliation in violation of the FMLA (Count IV). "The ADA prohibits an employer from discriminating against an otherwise qualified individual based on a real or perceived disability." Murray v. Warren Pumps, LLC, 821 F.3d 77, 83 (1st Cir. 2016). Massachusetts law contains a similar prohibition against discriminating on the basis of handicap or perceived handicap. Id. Ms. Katz's state and federal disability and perceived disability discrimination claims are governed by

11

essentially the same legal framework. See Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 125 n.3 (1st Cir. 2009) ("We previously have noted that Chapter 151B 'tracks the ADA in virtually all respects.'" (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 20 n. 5 (1st Cir. 2002))). Finally, "the FMLA prohibits retaliation against employees who take FMLA leave." Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012) (citing 29 C.F.R. § 825.220(c)). Although the FMLA does not expressly reference "retaliation," courts have found that the prohibition against retaliation is implicit in the statute. Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 n.2 (1st Cir. 2005).

Discrimination and retaliation claims under the FLMA, Chapter 151B, and the ADA are analyzed under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Archambault v. Kindred Rehab Servs., Inc., No. 14-cv-11675-ADB, 2016 WL 4555590, at *3 (D. Mass. Aug. 31, 2016) (first citing Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 69 (1st Cir. 2015); then citing Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999); and then citing Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005)).

Step one requires that the plaintiff establish a *prima facie* case of either retaliation or discrimination under the relevant statute. McDonnell Douglas, 411 U.S. at 802. If the plaintiff is able to establish this *prima facie* case, the Court infers discrimination, and, at step two, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination and to produce credible evidence to show that the reason advanced was the real reason. Id. at 802–03. To satisfy step two, the defendant must "clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's termination]." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160–61 (1st Cir. 1998) (alteration in original) (quoting

12

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)). "The explanation provided must be legally sufficient to justify a judgment for the [employer]." Id. at 161. If the defendant demonstrates a legitimate reason for its adverse action, "the presumption of discrimination drops from the case" and the burden shifts back to the plaintiff. Id. At step three, the plaintiff "must proffer evidence to establish that [defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus." Tobin, 433 F.3d at 105. The burden of proving unlawful discrimination rests with the plaintiff at all times. Id.

The crux of the dispute on summary judgment is whether Ms. Katz has raised a genuine issue of material fact as to whether discrimination motivated the adverse employment action. At step one, Organogenesis does not concede that Ms. Katz has established a *prima facie* case of discrimination, but neither party has briefed the issue in favor of addressing the pretext issue, which controls. Accordingly, the Court assumes without deciding that Ms. Katz has met her burden of establishing a *prima facie* case of discrimination and retaliation. Cf. Bonilla-Ramirez v. MVM, Inc., 904 F.3d 88, 94 (1st Cir. 2018) (assuming without deciding that plaintiff established a *prima face* case under McDonnell Douglas framework).

The parties agree that Organogenesis has met its burden of production under step two by identifying three legitimate, nondiscriminatory reasons for terminating Ms. Katz, as outlined in Mr. Moran's May 31, 2016 memorandum: (i) that the ongoing problems with the RAM system "on Ms. Katz's watch" had led to negative audit findings, CAPAs, and problems with operations; (ii) that Ms. Katz's position was redundant of Mr. Carmichael's role after the switch to the RAM system and Mr. Carmichael had a stronger performance history; and, (iii) that Organogenesis needed to create a position for a subject-matter expert to oversee the day-to-day administration of

13

the RAM system, and Ms. Katz was not qualified to fill this role.  See [ECF No. 29 at 14; ECF No. 32-23; ECF No. 35 at 6].

To survive summary judgment and make a showing of pretext, Ms. Katz must "clear two significant hurdles:" first, she must refute Organogenesis' evidence that it was Ms. Katz's poor performance and the department's reorganization, not her disabilities, that constituted the real reason for her termination; second, she must present evidence showing that Organogenesis' asserted reasons were pretext masking discrimination.  Tobin, 433 F.3d at 105; see Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 25 (1st Cir. 2015) (noting that, at summary judgment, "a plaintiff must do more than merely 'impugn the veracity of the employer's justification,'" and must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive" of discrimination (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)); cf. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004) (noting that, at the summary judgment stage, "the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus" (quoting Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535–36 (1st Cir. 1996)).

Organogenesis puts forth three distinct nondiscriminatory reasons for Ms. Katz's termination related to her allegedly poor performance and a departmental reorganization: problems with the RAM system under Ms. Katz's supervision, the redundancy of Ms. Katz's position in light of Mr. Carmichael's promotion and her weaker performance history as compared to Mr. Carmichael, and Organogenesis' need for a RAM subject-matter expert.  See

14

[ECF No. 29 at 14]. Ms. Katz's brief focuses on demonstrating circumstantial evidence of discriminatory intent, including the temporal proximity of her termination to the protected activity, comments by Mr. Moran evidencing a retaliatory mindset, differential treatment, and the credibility of Mr. Moran's rationale for termination. [ECF No. 35 at 6–10]. The evidence Ms. Katz presents calls into question the legitimacy of Organogenesis' first rationale. See [id.]. For example, Ms. Katz raises the temporal proximity of her return to work from FMLA leave to Mr. Moran's decision to terminate her employment and notes that her termination occurred "after two brief meetings . . . in which [Ms. Katz's] job performance or the RAM CAPA were never discussed . . . ." [Id. at 6–7]. She contends that Mr. Moran's comments to her and his interactions with her in these two meetings demonstrate a retaliatory mindset and that a reasonable inference from his statements is that "[her] medical leaves and [Mr. Moran's] desire to terminate her were connected . . . ." [Id. at 7]. Ms. Katz further argues that, as compared to Mr. Bartorelli who was terminated after a year of attempting to correct issues with the RAM CAPA, she "was terminated almost immediately after a return from a series of leaves which had left her no opportunity to do any of the things Mr. Moran apparently wanted done with respect to the RAM CAPA." [Id. at 8–9]. Finally, Ms. Katz also asserts that Mr. Moran's "stated reason for termination" is not credible because he "did not review any of [her] fifteen-year employment record, did not discuss her job performance with anyone, and did not speak with her about her role in the RAM CAPA." [Id. at 9–10].

The evidence Ms. Katz presents, however, fails to suggest that the reorganization Organogenesis was undergoing, including Mr. Carmichael's promotion and the company's need for a RAM subject-matter expert, was a sham. For instance, Ms. Katz identifies Mr. Carmichael as a comparator and notes that Organogenesis states that he was promoted based on his "role and

15

track record in the company," but she does not suggest that the reorganization was fictitious, refute the rationale for his promotion, or dispute that his performance was objectively superior to hers, including his performance on the RAM CAPA. See [id. at 8]; cf. Connell v. Bank of Bos., 924 F.2d 1169, 1181–82 (1st Cir. 1991) (Torres, J., concurring) (concurring in upholding summary judgment on age discrimination and retaliation claims because the record failed to suggest that the reorganization that was the basis for plaintiff's termination was "fictitious" and because plaintiff failed to demonstrate that his performance, while satisfactory, was equal to or better than employees who were retained in the reorganization).

Under the burden-shifting framework, "[w]hen an employer offers multiple legitimate, nondiscriminatory reasons for an adverse employment action, a plaintiff generally must offer evidence to counter each reason." Sher v. U.S. Dep't of Veterans Affairs, 488 F.3d 489, 508 (1st Cir. 2007); see Rathbun v. Autozone, Inc., 361 F.3d 62, 79 (1st Cir. 2004); see also Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (holding that, to avoid summary judgment, a plaintiff must present "evidence rebutting the employer's proffered legitimate reasons" that would "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action . . . ." (citation omitted)). In Sher v. U.S. Department of Veterans Affairs, 488 F.3d 489 (1st Cir. 2007), the First Circuit affirmed summary judgment for the Department of Veterans Affairs ("VA") on a Title VII national origin and religious discrimination claim because the plaintiff could not show that "*each* of the VA's legitimate, nondiscriminatory reasons for his removal was pretext for discrimination." 488 F.3d at 506–08. Similarly, in Rathbun v. Autozone, Inc., 361 F.3d 62 (1st Cir. 2004), the First Circuit affirmed summary judgment for an employer on a unequal pay claim under Rhode Island law because the plaintiff's evidence "[e]ven if fully

credited . . . succeed[ed] only in calling into doubt one of several rationales that [the employer] has advanced for its decision." 361 F.3d at 64, 72, 79. Although neither Sher nor Rathbun addresses claims brought under the FMLA, the ADA, or Massachusetts General Laws ch. 151B, the First Circuit's application of the same burden-shifting framework is relevant. There is no indication that the rule presented by Sher and Rathbun would not apply to a claim brought under the FMLA, the ADA, or Massachusetts General Laws ch. 151B when adjudication of that claim is governed by the McDonnell Douglas burden-shifting framework.

Accordingly, the Court concludes that Ms. Katz has not met her burden at step three of the McDonnell Douglas burden-shifting framework to establish that Organogenesis' non-discriminatory justifications are mere pretext because she has not presented evidence rebutting two of its three legitimate, non-discriminatory justifications. In coming to this conclusion, the Court is mindful of the First Circuit's instruction to "use restraint in granting summary judgment where discriminatory animus is in issue." Hodgens, 144 F.3d at 167 (quoting Denovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). Although courts must be "particularly cautious" when granting an employer's motion for summary judgment when the determinative issue is pretext, id. (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983)), the situation presented by this case is not the quality of the employee's evidence but the lack thereof. Even if Ms. Katz could make out a genuine issue of material fact regarding one of Organogenesis' stated reasons for termination, her failure to contest the other two legitimate, non-discriminatory reasons presented is dispositive. "[T]he question [on summary judgment] is not whether there is literally *no* evidence favoring the nonmovant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor." De Arteaga v. Pall Ultrafine Filtration Corp., 862 F.2d 940, 941 (1st Cir. 1988) (citing Anderson, 477 U.S. at 251).

17

The current record does not present a set of facts on which a jury could find in Ms. Katz's favor on any of her claims for discrimination or retaliation, and, thus, summary judgment is proper.

## IV. CONCLUSION

Accordingly, Defendant's motion for summary judgment [ECF No. 28] is <u>GRANTED</u>.

**SO ORDERED.**

September 20, 2019

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE